

Not Reported in N.E.2d                                                                                                                    Page 1
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

Williamson v. DT Management, Inc.
Mass.Super.,2004.

Superior Court of Massachusetts.
Fred WILLIAMSON et al.[FN1]

> FN1. Stephan Man, Howard Chang, and Mark Peters.

v.
DT MANAGEMENT, INC. d/b/a Boston Harbor Hotel, Inc.
**No. 021827D.**

March 10, 2004.

*MEMORANDUM AND ORDER ON (1) THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; (2) THE PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT; AND (3) THE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

S. JANE HAGGERTY, Justice of the Superior Court.
***1** Fred Williamson, Stephan Man, Howard Chang, and Mark Peters (collectively, "the plaintiffs") were each employed as Servers by DT Management, Inc., d/b/a Boston Harbor Hotel, Inc. ("the defendant") for varying periods of time at the Boston Harbor Hotel ("the Hotel"). The plaintiffs filed their complaint on April 30, 2002, based on acts that occurred during the plaintiffs' employment at the Hotel. In their amended complaint, the plaintiffs set forth the following allegations and requests for relief against the defendant: violation of G.L.c. 149, § 152A (Count I); quantum meruit (Count II); intentional interference with contractual relations (Count III); breach of contract (Count IV); breach of the covenant of good faith and fair dealing (Count V); conversion (Count VI); and unjust enrichment (Count VII).

The matter is currently before this Court on the defendant's motion for summary judgment as to all Counts of the plaintiffs' amended complaint; on the plaintiffs' cross motion for summary judgment as to their statutory claim (Count I); and on the plaintiffs' motion for class certification.

Prior to the filing of these motions, on November 27, 2002, the parties jointly moved to bifurcate liability and damages in the discovery phase of litigation. This motion to bifurcate was allowed on December 2, 2002 (Borenstein, J.). As a result, the motions currently before this Court deal with the issue of the defendant's liability only and, therefore, this Court will decide the propriety of summary judgment solely with respect to liability, making no determinations with regard to damages. For the reasons discussed herein, the defendant's motion for summary judgment is *ALLOWED* in part and *DENIED* in part; the plaintiffs' cross motion for summary judgment is *DENIED;* and the plaintiffs' motion for class certification is *DENIED.*

*BACKGROUND*

The material undisputed facts as revealed by the summary judgment record are as follows:[FN2] The plaintiffs are former Servers for the banquet department and restaurant at the Hotel, which is owned and operated by the defendant. Each plaintiff had an at-will employment relationship with the defendant. The plaintiffs readily admit that from the beginning of their employment at the Hotel, they were aware of and disagreed with the defendant's service charge distribution practice. This practice, upon which the plaintiffs' complaint is primarily based, involved the defendant's collecting the service charges paid by the event customers and distributing them among both the Servers and various employees in management positions at the Hotel, who also played roles in ensuring that the events were successful. The duties of various employees at the Hotel who received portions of the service charges, as well as the methods by which the defendant distributed these service charges, will be discussed below.

> FN2. Superior Court Rule 9A provides: "Each opposition to a motion for summary judgment shall include a response, using the same paragraph numbers, to the moving party's statement of facts as to which the moving party claims there is no genuine issue to be tried ... For purposes of the motion for summary judgment, facts contained in a statement described in the first paragraph hereof shall be deemed to have been admitted unless controverted in

Case 3:07-cv-30076-MAP   Document 8-2   Filed 06/08/07   Page 2 of 13

Not Reported in N.E.2d                                                                                                  Page 2
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

the manner set forth in the second paragraph hereof."

Here, the plaintiffs failed to comply with [Rule 9A](#) in their opposition to the defendant's motion for summary judgment. Rather than responding to the numbered paragraphs set out by the defendant as required by the Rule, the plaintiffs instead "take issue" with certain facts set out by the defendant, insofar as those facts contradict additional facts set fort by the plaintiffs in their opposition. The numbered paragraphs used in the plaintiffs' opposition do not correspond to those accompanying the defendant's motion and, thus, do not comply with [Rule 9A](#). Therefore, as mandated by the Rule, the material undisputed facts as set forth by the defendant "*shall be deemed to have been admitted*" by the plaintiffs. Super.Ct.R. 9A (emphasis added).

The plaintiffs were employed at the Hotel for the following periods of time: Fred Williamson, from April 27, 1993 until September 22, 1999; Mark Peters, from August 10, 1987 until December 12, 1999; Stephen Man, from August 10, 1987 until January 27, 2000; and Howard Chang, from November 7, 1990 until May 25, 1999.

### A. The Banquet Department

**\*2** The Banquet Department at the Hotel provides catering and banquet services to guests who hold private functions at the Hotel, and it coordinates, caters, staffs, and serves such functions for groups of as few as 20 and as many as 300 people.

An 18% "Service Charge" or "Banquet Gratuity" was added to Hotel customer invoices from the Banquet Department until June 1998. The Hotel distributed 84% of the charge (15% of the total bill) to the Servers who had waited on the banquet guests. Until 1995, each Server received a share of the charge based on his or her hours worked; and since 1995, the Servers have received their portion of the charge based on his or her "level" and hours worked.[FN3] The remainder of the service charge (3% of the total bill) was distributed to Catering Managers, Banquet Managers, Assistant Managers, and the House.

> [FN3.](#) The Hotel added this "level" component to the distribution system in response to complaints by the full-time, experienced servers who felt that they were not receiving a fair share of the service charges as compared to part-time, less experienced workers. This system is premised upon each Server receiving a rating between eight and eleven that is based on their performance, seniority, and availability.

From July 1998 to April 2001, the Hotel altered its practice, adding a 14% "Banquet Service Charge" or "Banquet Gratuity" and a 4% "Banquet Admin Charge" or "Banquet Admin Fee" to banquet customers' bills. The service charges/gratuities were distributed solely to the Servers based on their level and hours worked; and the admin fees/charges were distributed among Catering Managers, Banquet Managers, Assistant Managers, and the House. Since May 2001, the service charges/gratuities have been 14.5%; and the admin fees have been 4.5%; both distributed in the same manner as noted above. Additionally, Directors of Catering have occasionally received a portion of the administrative fees for their services performed at the banquet events. The duties of those who receive portions of either the service charges or the administrative fees are as follows:

Position: Catering Manager

Duties:

annual base salary: $15,000-$20,000

gross annual pay: $55,000-$65,000 (including admin fees)

responsible for generating new banquet business

coordinates banquet events

maintains Hotel's mission statement

manages sales of banquet events

does not manage employees or have authority to make or influence employment decisions affecting any Hotel employee

sole contact at Hotel for guest planning banquet

with guest, selects wine and menu for event

orders all special items for event (i.e. audio visual; etc.) and special meals

selects linen, china, and silverware for tables

prepares Banquet Event Order ("BEO") which is sent to customers and sets estimated bill for event

if appropriate, prepares and mails contract to customer itemizing estimated cost of event

informs customer of service charge and admin fee; which is also stated in contract

meets with guest before event and introduces Banquet Manager(s) for the event

assists the Servers and the kitchen staff for the duration of the banquet

occasionally, may (1) assist the Servers in setting up the function room; (2) ensure that special order items

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-30076-MAP    Document 8-2    Filed 06/08/07    Page 3 of 13

Not Reported in N.E.2d                                                                                              Page 3
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

are present and working properly; (3) ensure that service of the meal to guests is timed properly; (4) take, from time-to-time, beverage orders, serve beverages, pour water and wine, serve salads, soups, entrees, and desserts, and clear plates if necessary; and (5) assist in cleaning the room at the conclusion of the event

***3** Position: Director of Catering
Duties:
annual base salary: $15,000-$20,000
gross annual pay: $55,000-$65,000 (including admin fees)
generally performs same duties as Catering Managers for the events he or she coordinates
on occasion may stay to oversee large or important events that are coordinated by Catering Managers; majority of time is spent coordinating banquet events
responsible for the catering department's finances, forecasts revenue, orders equipment as needed, and administers payroll
supervises Catering Managers and has authority to approve employees' requests for vacation time
works with the Executive Chef to change the menus seasonally
Position: Banquet Manager
Duties:
annual base salary: $20,000
gross annual salary: $75,000 (including admin fees)
generally responsible for scheduling the work hours for banquet employees, which requires a review of the BEO at least one week prior to event
on day of event, meets with the Servers and kitchen staff scheduled to work the event to review the BEO and discuss the details of the function; assigns Servers to their posts
when an event involves 200 or more guests, more than one manager will handle the event
throughout the event, serves as point-person for contact with the guests
present for and assists the Servers and kitchen staff through the entire event
supervises and assists the Servers in setting up the function room
coordinates with kitchen staff to ensure that special meals are prepared as per the BEO
ensures that other special order items are present and working properly
ensures that service of the meal to the guests is timed properly
occasionally pours wine for guests
supervises the cleaning of the room at the conclusion of the event
assists in re-arranging the room in preparation for the next function
Position: Assistant Banquet Manager
Duties:
annual base salary: $16,000
gross annual salary: $50,000-$55,000 (including admin fees)
generally has the same duties as a Banquet Manager
Position: Server
Duties:
on average, full-time banquet Servers earn a gross annual income of approximately $65,000 to $75,000, including wages and service charges [FN4]

> [FN4.] Mark Peters, for example, testified at his deposition that when ho began working for the defendant, he received a base pay of $3.50 per hour.

staffed at events based on desired ratio of Servers to guests: for breakfast and lunch, 1:15; for dinner, 1:10; and for a reception, 1:20
follows BEO created by Catering Manager or the Director of Catering in order to perform his or her function at the event
assists in the arrangement or clean-up of the room and takes beverage orders
transports pre-selected appetizers and meals from the kitchen to the guests' tables
does not have authority to order special items; does not inform guests of specials or take orders from guests
receives hourly wage plus a share of the service charge/gratuity added to the bill
Hotel does not prohibit guests from leaving additional voluntary gratuity, which they sometimes do, and this gratuity is evenly split among the Servers working the event

### B. The Private Dining Room

***4** The Restaurant, which opened with the Hotel in 1987, closed on June 1, 2002. It had two private dining rooms in which the Servers waited on guests having private parties. The Hotel added an administrative fee and/or service charge to the guests' bills for functions held in its private dining rooms (PDRs). Until December 1998, the Hotel added an 18% "PDR Gratuity" or "Gratuity" to the PDR customers' bills. The Servers who waited on PDR guests received 78% of the 18% gratuity charge (14% of the total bill); and each Server received an equal share of that percentage. The PDR Coordinator, the Restaurant Manager, and the Assistant Restaurant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-30076-MAP    Document 8-2    Filed 06/08/07    Page 4 of 13

Not Reported in N.E.2d                                                                                                    Page 4
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

Managers each received portions of the remainder of the gratuity (4% of the total bill).

From January 1999 to May 2001, the Hotel amended its PDR billing and distribution practice by adding a 15% "Gratuity" and a separate 3% "Admin Fee" to PDR customers' bills. The Servers received equal shares of the gratuity; and the PDR Coordinator, Restaurant Manager, and Assistant Restaurant Managers received portions of the separate administrative fee. From June 2001 until June 2002, the administrative fee was increased to 4% but the distribution of the service charges and administrative fees remained the same.

The Servers, bartenders, service assistants, kitchen staff, Restaurant Managers, Assistant Restaurant Managers, and PDR Coordinator were notified of the service charge and administrative fee distribution practice for PDR events. Beginning in 1999, the PDR Coordinator created PDR BEOs which stated that the Hotel adds a service charge and an administrative fee to the PDR customers' final bills. The customers received a copy of the BEO. The services provided by those who worked the PDR functions were as follows:
Position: PDR Coordinator
Duties:
annual base salary: $25,000
gross annual salary: $35,000 (including admin fees)
in coordinating a PDR event followed virtually the same procedures and performed the same tasks as Catering Managers did with respect to banquet events
not a manager and had no authority to make or influence employment decisions affecting any Hotel employee
when the Restaurant did not have a PDR Coordinator, the Restaurant Manager or the Assistant Restaurant Manager performed these functions
Position: Restaurant Manager and Assistant Restaurant Manager
Duties:
manager annual base salary: $55,000
manager gross annual pay: $60,000 (including admin fees)
assistant annual base salary: $30,000
assistant gross annual salary: $35,000 (including admin fees)
akin to duties of the Banquet Managers
Position: Server
Duties:
average gross annual income: $50,000 (including gratuities)
ratio of Servers to guests: 1:15 (the two PDRs had capacities of 18 and 32 guests, respectively)-on average, two Servers served food and beverages during a PDR event
not unusual for multiple PDR events to occur simultaneously in both of the PDRs, or for Servers to work multiple PDR events at one time
**\*5** the Hotel allowed Servers to work PDR events and the main dining room simultaneously
in the main dining room, Servers, while maintaining the Hotel's mission statement (1) informed guests of the day's specials; (2) took guests' beverage orders; (3) took guests' appetizer and meal orders; (4) communicated the guests' beverage and meal orders to the bartender and kitchen; (5) assisted guests in selecting wine; (6) served beverages to customers (included pouring water and wine); (7) ensured that the kitchen's preparation of the meal was timed properly; (8) served guests their meals; and (9) presented bill to guests at the conclusion of their meal
in the main dining room, the Servers received their hourly wages plus 100% of the tips left by restaurant customers
during a PDR event the Servers were required to fulfill the Hotel's mission statement and follow the event BEO-they did not need, however, to inform the guests of the day's specials or take meal or wine orders, because these items had been pre-selected
at PDR event, the Servers assisted in the arrangement and clean-up of the room; took beverage orders; and transported the pre-selected appetizers and meals to its guests' tables
did not have authority to order special items
Servers who worked PDR events received their hourly wage plus an evenly divided share of the gratuity charge added to the final bill (spilt among Servers working at the event)
Hotel did not prohibit guests from leaving additional voluntary gratuity, which they sometimes did, and this was split evenly among the Servers working the event

### DISCUSSION

*I. The Defendant's Motion for Summary Judgment and the Plaintiffs' Cross Motion for Summary Judgment*

Generally, the court grants summary judgment where there arc no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. *Cassesso v. Comm'r of Corr,* 390 Mass. 419, 422 (1983); *Cmty. Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-30076-MAP    Document 8-2    Filed 06/08/07    Page 5 of 13

Not Reported in N.E.2d                                                                                                      Page 5
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. *Id.* In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *Cmty.* Nat'l Bank, 369 Mass. at 553; Mass.R.Civ.P. 56(c).

With a motion for summary judgment before it, the court should not weigh evidence, assess credibility, or find facts; and it may only consider undisputed material facts and apply them to the law. See Kelley v. Rossi, 395 Mass. 659, 663 (1985). The nonmoving party cannot defeat the motion for summary judgment by resting on his or her pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Similarly, vague and general allegations of expected proof arc not enough to defeat a summary judgment motion. Cherella v. Phoenix Technologies, Ltd., 32 Mass.App.Ct. 919, 920 (1992). Further, "[a] complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial." Lyon v. Morphew, 424 Mass. 828, 831 (1997).

*A. Statute of Limitations*

**\*6** The defendant argues that it should not be held liable for the distribution of service charges to management employees that occurred prior to the accrual of the applicable statute of limitations. The plaintiffs, however, contend that the defendant should be held liable for all acts it committed during the employment relationship that constitute statutory or common-law violations, presumably relying on a continuing violation theory.

The continuing violation doctrine arose in the Commonwealth when the Massachusetts Commission Against Discrimination ("MCAD") promulgated 804 Code Mass. Regs. § 103(2), pursuant to their statutory authority under G.L.c. 151B. See Carter v. Comm'r of Corr., 43 Mass.App.Ct. 212, 222 (1997). In federal courts, the doctrine is primarily utilized in causes of action arising under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* See, e.g. Provencher v. CVS Phamacy, 145 F.3d 5, 14 (1st Cir.1998); United Cities Gas Co. v. Brock Exploration Co. 984 F.Sup. 1379 (D.Kan.1997). "[T]he ... doctrine has been applied very infrequently outside the Title VII employment discrimination context ... The limited areas in which courts have broadened [its] application have involved explicit statutory language, unequivocal legislative intent or contractual arrangements." United Cities Gas Co. 984 F.Sup. at 1388 (citations omitted).[FN5]

> FN5. Cf. Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1050 (5th Cir.1973) ("Sex-based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act"), cert. denied at 414 U.S. 822 (1973).

Similarly, the continuing violation doctrine has not been applied in Massachusetts courts outside of the discrimination context. The plaintiffs, citing to an unpublished Tennessee Court of Appeals decision, argue that the motivations for applying the continuing violation doctrine in discrimination cases are applicable to actions arising from violations of G.L.c. 149, § 152A (the "Massachusetts Tips Statute"). See Owens v. Univ. Club of Memphis, 1998 WL 719516, \*15 (Tenn.Ct.App.1998) (applying doctrine to action under Tennessee Tip Statute where there was evidence that the defendant "may have deliberately hidden the fact that the plaintiffs were not paid all of their tips"). Though the analysis in the cited opinion is not completely inapposite, this Court declines to apply the same reasoning here, as its application would result in. a departure from well settled Commonwealth precedent on this issue.

Moreover, there is no evidence before this Court that the parties contractually agreed to apply the continuing violation doctrine to employment disputes arising from their relationship or, upon an examination of its legislative history, that the Legislature intended the doctrine to apply in cases arising under the Massachusetts Tips Statute. Nor does the plain language of the statute indicate in any way that the continuing violation doctrine should apply in these circumstances. Accordingly, the statue of limitations accrued each time the plaintiffs were paid portions of service charges by the defendant and, for actions arising under Chapter 149, Section 152A, ran for three years therefrom.[FN6] See, e.g., *Miller v. Trinity Oil Co.,* 10 Mass. L. Rptr. 60, 1999 Mass .Super. LEXIS 156, \*5-\*6 (Middlesex Super.Ct. Apr. 2, 1999) (Brassard, J.) (finding that where plaintiff filed complaint in June 1997 alleging that overtime wages were not paid to him from 1992-1995 in

Case 3:07-cv-30076-MAP   Document 8-2   Filed 06/08/07   Page 6 of 13

Not Reported in N.E.2d                                                                                      Page 6
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

violation of the Wage Act, applicable statute of limitations was two years and therefore claim was time barred).[FN7]

> FN6. Even in cases where the continuing violation doctrine is held to be applicable, it is recognized that while a plaintiff may use time-barred events "as background evidence of a hostile work environment ... [regardless,] she cannot recover damages for the time-barred events." *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 539 n. 20 (2001).

> FN7. Additionally, *Miller* held that the discovery rule did not apply to toll the statute of limitations because plaintiff admitted knowing that he was not receiving overtime compensation for the period complained of, and the court further held that ignorance of the law applicable to the payment of overtime wages was irrelevant. *Miller,* 10 Mass. L. Rptr. 60, 1999 Mass.Super.LEXIS at *7 ("[T]he discovery rule does not toll the statute of limitation when plaintiff is unaware of the law, rather, the rule delays accrual of a cause of action until the plaintiff learns about the facts giving rise to the injury"), citing *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.,* 29 Mass.App.Ct. 215, 222 (1990).

**\*7** Pursuant to G.L.c. 149, § 150, the statute of limitations for an action brought under Section 152A is three years. The statute of limitations for tort claims is also three years. G.L.c. 260, § 2A. The statute of limitations for contract actions, however, is generally six years. G.L.c. 260, § 2. Therefore, if the defendant is found liable for statutory violations, it is conceivable that those violations may form the basis for the plaintiffs' contract actions going back six years from the time they filed their complaints, expanding the time period for which the defendant may be found liable to the plaintiffs.

### B. Liability Under G.L.c. 149, § 152A

The core issue of these motions for summary judgment lies in the statutory interpretation of the words "employees" and "service provided" as used in the second sentence of Section 152A, which states that: "If an employer or other person submits a bill or invoice indicating a service charge, the total proceeds of such charge shall be remitted to the *employees* in proportion to the *service provided* by them." G.L.c. 149, § 152A (emphasis added).

Generally, considerations for this Court when interpreting the Massachusetts Tips Statute include "the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may he effectuated." *Chelmsford Trailer Park, Inc. v. Chelmsford,* 393 Mass. 186, 196 (1984), quoting *Commonwealth v. Graham,* 388 Mass. 115, 119 (1983). Legislative intent must be derived foremost from "the words of the statute, given their natural import in common and approved usage, and with reference to the conditions existing at the time of enactment." *Int'l Org. of Masters v. Woods Hole, Martha's Vineyard & Nantucket Steamship Auth.,* 392 Mass. 811, 813 (1984), citing *Pacific Wool Growers v. Comm'r of Corps. & Taxation* 305 Mass. 197, 198-99 (1940); *Randall's Case,* 331 Mass. 383, 385 (1954).

The defendant asserts that the plain language of the statute dictates that the distribution of service charges not be limited to employees who serve food or beverage. Its logic is that the first sentence of the statute, where the word "employee" is modified with the phrase "engaged in the serving of food or beverage," refers solely to tip pooling.[FN8] Conversely, therefore, it is argued that because the second sentence of the statute does not contain the modifying phrase, the service charges it refers to may be distributed to *any* employees, in proportion to the services they provide. The defendant argues that the Legislature could have modified "employee" in the second sentence and that its failure to do so indicates an intent to treat tip pooling differently from the distribution of service charges. As a result, the defendant asserts, its non-wait staff employees who are employed to ensure that banquet and PDR customers have an enjoyable experience at the Hotel and who are thus engaged in broadly servicing the customers, are entitled to a portion of the service charges. It contends that the Legislature, in enacting Chapter 149, Section 152A, specifically intended for non-wait staff employees to be rewarded if involved in the success of a banquet.

> FN8. "No employer or other person shall solicit, demand, request or accept from any employee engaged in the serving of food or beverage any payment of any nature from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                       Page 7
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

tips or gratuities received by such employee during the course of his employment ..." G.L.c. 149, § 152A.

**\*8** The plaintiffs, on the other hand, argue that fulfilling the legislative intent requires that the word "employee" be given the same meaning throughout Section 152A rather than, as the defendant argues, giving it two distinct and internally inconsistent meanings.

The law in the Commonwealth regarding the Massachusetts Tips Statute is both scarce and far from well settled. There are currently only a few available opinions interpreting and applying Section 152A, all from the Superior Court. See *Fraser v. Pears Co* .,[FN9] Civil No. 01-4163-H, 16 Mass. L. Rptr. 255, 2003 Mass.Super. LEXIS 152 (Suffolk Super. Ct. May 5, 2003) (Brady, J.) (holding that, upon examination and interpretation of first sentence in Section 152A, mandatory tip pooling was permitted under the Massachusetts Tips Statute);[FN10] *Cooney v. Compass Group et al* ., Civil Action No. 02-3159 (Middlesex Superior Court, January 7, 2004) (Muse, J.) (whether "service charge" is a gratuity or a facilities surcharge is a question of fact dependant upon the intent of the customer and the facility); *Chance v. Westban Hotel Venture, LP d/b/a Hotel Copley Place,* Civil No. 97-4947-A (Suffolk Superior Court, November 22, 2000) (Volterra, J.) (holding that banquet captains were entitled to portions of service charges under broad definition of "service" that the court read into second sentence of Section 152A; but that a certain aspect of the distribution system violated the proportionality requirement of statute). See also, *Nedved v. 1760 Society, Inc., d/b/a The Sherborn Inn, and the 1760 Eating and Dining Society, Inc.,* Civil Action No.2002-1491 (Worcester Superior Court, February 18, 2004) (McCann, J.) (17 Mass. L. Rptr. 350) (holding that distribution of "service" to banquet coordinators is permitted by statute).

> FN9. This case is currently pending in the Supreme Judicial Court, SJC No.2003-P-1141.
>
> FN10. *Fraser* also held, citing in the statutory interpretation set forth in *Chance,* that the maitre'd was permitted to share in the tip pool because he provided " 'service' to patrons within the meaning of Section 152A[,]" but *Fraser* specifically recognized that the wrong intended to be addressed by the statute, "namely 'kickbacks' of part of service employees' tips to managers and owners" was not the situation that the court dealt with. *Fraser,* 2003 Mass.Super. LEXIS at \*10, \*10 n. 4.

*Fraser* is currently being considered by the Supreme Judicial Court, and arguments are scheduled for March 2004. Should the SJC address the issue of statutory interpretation in a way contrary to this Court's decision herein, the parties are of course welcome to file a motion for reconsideration.

*Chance* held that "service" as used in the second sentence of Section 152A encompassed much more than the actual serving of food and beverages, rather, "[s]ervice is the act of caring for the needs and wants of the patron-not simply putting a plate in front of the patron and filling his or her wine goblet." *Chance* at 3. The court came to that conclusion upon looking at the definition of "service" in Webster's New International Dictionary of the English Language Unabridged,[FN11] applying various rules of statutory construction, and making findings about the custom and practice of nonunion hotels with regard to the distribution of service charges for banquet functions.[FN12]

> FN11. "Service is defined in many ways, including 'to perform services for ... to meet the needs of' and 'the bringing of food and drink to diners seated at table.' " *Chance* at 15.
>
> FN12. "I rule that the custom and practice at banquet functions in non-union hotels in Boston was to have banquet captains share in the 14% service charge even though the captain was not actually assigned a table. Industry custom and practice is material evidence that a court can take into account." *Chance* at 17.

The *Chance* court's definition of "service" as used in the Massachusetts Tips Statute, however, likely encompasses anyone employed by or associated with the Hotel, including its owners. This broad, expansive reading of Section 152A is inconsistent with not only the purpose of the statute, but its plain language as well. Where a statute is unambiguous and clear on its face, courts usually do not turn to legislative history for statutory interpretation, but when "interpreting a general but undefined term ... we have sanctioned an evaluation of the legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-30076-MAP   Document 8-2   Filed 06/08/07   Page 8 of 13

Not Reported in N.E.2d                                                                                      Page 8
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

history so as to reach a result consistent with the statute's purpose." *McCarthy v. Comm'r of Revenue, 391 Mass. 630, 633 (1984)*. When faced with a term that is capable of differing meanings, moreover, it must be assumed that the Legislature "adopted the particular meaning that best served its purpose and aim in enacting the statute ." *St. George's Ebenezer Primitive Methodist Church v. Primitive Methodist Church,* 315 Mass. 202, 205 (1943).[FN13] The terms "employee" and "service" are such general words capable of differing interpretations depending on their context and they remain undefined in Chapter 149.

> FN13. Ordinarily, "[w]here a statute does not define its words, we will give them 'their usual and accepted meanings, *as long as these meanings are consistent with the statutory purpose.*' " *Commonwealth v. Correia,* 17 Mass.App.Ct. 233, 235 (1983) (emphasis added), review denied at 391 Mass. 1101 (1984), quoting *Commonwealth v. Zone Book, Inc.,* 372 Mass. 366, 369 (1977). See also, *American Honda Motor Co. v. Bernardi's, Inc.,* 432 Mass. 425, 430 (2000).

*\*9* The defendant argues, and this Court agrees, that much of the so-called legislative history put forth by the plaintiffs does not actually constitute legislative history on which this Court may rely in determining legislative intent.[FN14] We are left, therefore, with a somewhat anemic legislative history and are forced to derive the bulk of the legislative intent from the language of the statute itself, as "the primary source of insight into the intent of the Legislature is the language of the statute." *Int'l Fid. Ins. Co. v. Wilson,* 387 Mass. 841, 853 (1983).

> FN14. "Evidence as to statements attributed to individual legislators as to their motives or mixtures of motives in considering legislation are not an appropriate source from which to discover the intent of the legislation ... Consistently, the courts have confined their review to statutory words and official legislative records." *Admin. Justice of the Hous. Court Dep't v. Comm'r of Admin.,* 391 Mass. 198, 205 (1984).

The official legislative records relative to the Massachusetts Tips Statute include bills that were introduced in the House and the Senate. In 1983, Senate Bill No. 60,[FN15] entitled "An Act Protecting Certain Employees from Deprivation of Tips, Gratuities or Service Charges" was introduced to amend Section 152A by inserting the following language after the first sentence;

> FN15. "By Mr. Bachrach, a petition (accompanied by bill, Senate, No. 60) of George Bachrach, Thomas M. Gallagher and Peter A. Vellucci for legislation to protect food service employees from deprivation of tips, gratuities or service charges."

For the purpose of this section service charges shall be considered a gratuity given to an Employer for the benefit of an Employee or Employees as the case may be. Any provision for the charges other than for tips, gratuities or service charges appearing on a bill, contract, receipt or other writing must clearly state the purpose of such charge and Employees must be given a copy thereof.

Also in 1983, House Bill Nos. 1627 [FN16] and 2857 [FN17] were introduced with the same title, proposing to add section 152B to Chapter 149:

> FN16. "By Mr. McNeil of Leicester, petition of the Massachusetts AFL-CIO and Robert D. McNeil to protect certain employees from deprivation of tips, gratuities or service charges."

> FN17. "By Mr. Galvin of Boston, petition of William F. Galvin for legislation to protect employees from deprivation of tips, gratuities or service charges paid directly to or for them."

No employer or other person shall solicit, demand, request or accept from any employee engaged in the serving of food or beverage any payment of any nature from tips or gratuities received by the employee. Any and all charges other than tips or gratuities shall be construed as a service charge and shall inure to the benefit of the employee.

Though none of these Bills were ever passed as amendments to Section 152A, they do shed some light on what the Legislators were considering in amending the Massachusetts Tips Statute and, although not identical to the Bills finally passed, they are substantially similar. Notably evidenced through these Bills is a desire to treat tips, service charges, and gratuities as one in the same for the purposes of this statute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                                  Page 9
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

On August 5, 1983, St.1983, c. 343 was approved, substituting "the total proceeds of such charge shall be remitted to the employees in proportion to the service provided by them" for "such a bill shall clearly state the services rendered for such charges and the amount of such charge paid as a tip or gratuity." The amended language indicates a shift in responsibilities imposed by the statute. Prior to the amendment, Section 152A's language was customer based, where employers had to disclose exactly to whom and for what the service charges were going, particularly showing to the customer just how much of the service charge was being paid as a tip or gratuity. This language evidences a recognition that the customer's expectation was for a service charge on their bill to go to the persons who served them directly, and that if it was distributed otherwise, i.e., to the managers and/or the house, they should be told so in a precise and relatively detailed manner.

**\*10** The amended language, on the other hand, shifts the onus onto the employer to distribute the service charges proportionately among the servers rather than require the customer to examine how their charge is parsed out and then make a determination whether to leave additional gratuities for their server. Moreover, the title of Section 152A is "Payment to, or retention by, employer of tips to employees; contract for employment." There is not a separate section dealing exclusively with service charges but rather, the three categories of payments (tips, gratuities, and service charges) are all grouped into the same section and used synonymously, showing an intent to treat them in the same fashion.

In determining the appropriate definition of general words used in a statute, the courts may look to sources outside the statute such as "their use in other legal contexts: and dictionary definitions." Commonwealth v. Correia, 17 Mass.App.Ct. 233, 235 (1983), quoting Zone Book, Inc., 372 Mass. at 369. To reiterate, however, a dictionary definition is not helpful if it doesn't serve to further the purposes underlying the statute, which can be gleaned from an examination of the plain language of the statute in addition to its legislative history.

The terms "employee" and "service" in the second sentence of Section 152A must be interpreted in conjunction with the entire section, not just the sentence in which they are used, because "[a] general term in a statute ... takes meaning from the setting in which it is employed." Kenney v. Bldg. Comm'r of Melrose, 315 Mass. 291, 295 (1943) ("The literal meaning of a general term in an enactment must be limited so as not to include matters that, although within the letter of the enactment, do not fairly come within its spirit and intent"). See also, Polaroid Corp. v. Comm'r of Revenue, 393 Mass. 490, 497 (1984) ("[W]ords of a statute must be construed in association with other statutory language and the general statutory plan"); Hodgerney v. Baker, 324 Mass. 703, 705 (1949).

In furtherance of effectuating legislative intent, this Court will also employ the principle of *ejusdem generis,* which is a rule of statutory constriction "employed to ascertain the correct meaning of words by limiting 'general terms which follow specific ones to matters similar to those specified.' " Powers v. Freetown-Lakeville Regional Sch. Dist. Comm., 392 Mass. 656, 661 n. 8 (1984), quoting United States v. Powell, 423 U.S. 87, 91 (1975). In other words, "*[t]he applicable rule is that particular words and phrases will limit and define general words and phrases which are to be found within the confines of the same statute and which might embrace related acts or conduct.*" Koller v. Duggan, 346 Mass. 270, 273 (1963) (emphasis added), citing Appleton v. Massachusetts Parking Auth., 340 Mass. 303, 309 (1960). Additionally, "[t]he Legislature is presumed to use a term in the sense in which it has been used before in the same context." Commonwealth v. Mercy Hosp., 364 Mass. 515, 520 (1974).[FN18] Under this principle, it would be incongruous to hold that the phrase "engaged in the service of food and beverage" modifies the word "employee" in the first sentence of the section, but then does not modify or even relate to the term "employee" as used in the second sentence of the section.

> FN18. See also, Chelmsford Trailer Park, Inc., 393 Mass. at 197 ("It is a 'fundamental principle of statutory construction that in interpreting any particular provision it should be construed as part of the statute as a consistent whole' "), quoting Walker v. Bd. of App. of Harwich, 388 Mass. 42, 51 (1983); Whitehall Co., Ltd. v. Alcoholic Beverages Control Comm'n, 7 Mass.App.Ct. 538, 540 (1979) ("[W]here the Legislature uses the same words in several sections which concern the same subject matter, the words must be presumed to have been used with the same meaning in each section"), quoting Ins. Rating Bd. v. Comm'r of Ins., 356 Mass. 184, 188-89 (1969).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-30076-MAP   Document 8-2   Filed 06/08/07   Page 10 of 13

Not Reported in N.E.2d                                                                                                   Page 10
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

**\*11** Furthermore, the language of a statute "should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *Sullivan v. Brookline,* 435 Mass. 353, 360 (2001). It would be illogical to interpret the Massachusetts Tips Statute so as to provide protection to employees who serve food and beverages with regards to tip pooling and then to simultaneously say that service charges imposed by the employer can be distributed to virtually any employee, so long as it can be said that they furthered the positive experience of the customer, without any regard to the services actually provided by that employee. Here, the Servers are the only employees whose primary duty is to engage in the service of food and beverages. As such, they are entitled to the full benefit of any tips, gratuities, or service charges paid to them directly or to their employer on their behalf. Any payments from these monies to management, the house, or others not engaged in the service of food or beverages as their primary duty for the particular event is a violation of the Massachusetts Tips Statute.

As pointed out by the defendant, however, nothing in Section 152A prohibits the distribution of an "administrative fee" to employees other than the Servers at the Hotel. The defendant altered its distribution practice for the banquet department in July 1998, and for the private dining room functions in January 1999. With this change, the defendant added both a service charge and a separate administrative fee to its customers' bills. This change remedied the defendant's prior violative practice of distributing portions of the service charge to employees other than Servers. Thereafter, the service charge was distributed solely among the Hotel's Servers, and the administrative fee was distributed among the various management level employees.FN19 The plaintiffs did not file their complaint until April 30, 2002. Since the amended distribution practice went into effect more than three years prior to the complaint filing date, the statutory and tort claims here, all with three-year statutes of limitations, are untimely.

> FN19. The plaintiffs argue that the defendant remained in violation of the Massachusetts Tips Statute even after it altered its distribution practice, pointing to BEOs and customer bills which itemize separate "gratuity" and "admin fees" and then include a "service charge total" towards the bottom, constituting the total of the gratuity charge and the administrative fee. Firstly, this Court is not of the opinion that the BEO is the statutory equivalent of bills or invoices and, secondly, this Court believes that customers are savvy enough to see that just a few lines above the service charge total is a breakdown of those charges, including the percentages applicable to each charge.
>
> As such, though using the label "service charge" may at first glance appear to trigger the statute, it is readily apparent that the defendant's current practices are in conformity with the fundamental purposes of the statute, namely fulfilling customers' expectations with respect to who receives gratuities, and ensuring that those engaged in the service of food or beverages to those customers receive those gratuities proportionately. Though the plain language of the statute employs the term "service charge," here we clearly have separate administrative fees and gratuities that happen to be described as service charges generally when they are totaled on the bill. To construe that the administrative fee somehow becomes a service charge by virtue of its being described as such in a "total" entry a few lines down the bill elevates form over substance and misconstrues the document as a whole, to a degree that this Court declines to follow.

The plaintiffs, however, may still recover under whichever contractual claims are viable, as discussed below, because the Hotel's violations of Chapter 149, Section 152A may form the basis for contractual actions, whose statute of limitations is six years. Therefore, as a general matter, the defendant may be liable to the plaintiffs under contract theories for the following time periods: from April 30, 1996 (six years prior to the filing of the present action) until July 1998 for banquet events; and from April 30, 1996 until January 1999 for PDR events.

*C. Proportionality Requirement*

The plaintiffs argue that the defendant's practice of using the "level" rating system, in conjunction with the Servers' hours worked at the particular event, to determine how much of the service charge/gratuity each Server receives violates the proportionality requirement of Section 152A. The second sentence of that section provides that "the total proceeds of such

[service] charge shall be remitted to the employees *in proportion to the service provided by them.*" The defendant, however, argues that the system, which assigns a level to each Server depending on their performance, seniority, and availability, was implemented specifically in response to Server complaints from more experienced Servers that they were not being paid sufficiently, relative to the lesser experienced Servers.

**\*12** The plaintiffs dispute the method by which each Server is assigned a level number, but as previously noted, the facts set forth by the defendant must be taken as true for the purposes for this summary judgment motion. As such, this Court must take at face value the defendant's assertions as to the factors that go into assigning a level to each Server, and cannot credit the plaintiffs' claim that it is merely a popularity system rewarding those Servers whom the managers are most fond of. Upon the evidence before this Court, it is not readily apparent that the distribution system currently in place violates the proportionality requirement of the Massachusetts Tips Statute. The plaintiffs have not brought forth any evidence tending to show that the distribution system results in payments that are disproportional to the services provided by the Servers, rather, they simply argue that proportionality is a factual question for the jury. Since they did not allege any specific facts that would indicate such a violation, therefore, summary judgment must be granted in favor of the defendant on the plaintiffs' statutory claim with respect to the defendant's distribution practices that fall within the applicable three-year statute of limitations.

### D. Liability Under Common-law Claims

The plaintiffs' common-law claims include: quantum meruit (Count II); intentional interference with contractual relations (Count III); breach of contract (Count IV); breach of the covenant of good faith and fair dealing (Count V); conversion (Count VI); and unjust enrichment (Count VII).

#### 1. Quantum Meruit (Count II)

For a successful claim for quantum meruit, the plaintiffs must show that: (1) they "conferred a measurable benefit upon" the defendant; (2) "the defendant accepted the services with the expectation of compensating the plaintiff [,] ... [and] the test [for this element] is whether a reasonable person would have expected to pay[;] and (3)[ ] the plaintiffs 'provided the services with the reasonable expectation of receiving compensation from the defendant.' " *Bolen v. Paragon Plastics, Inc.* 747 F.Sup. 103, 106-07 (D.Mass.1990).

As previously discussed, this Court finds that the defendant was in violation of G.L.c. 149, § 152A prior to the time it amended its payment practices in June 1998 for the Banquet Room, and in December 1998 for the PDRs. Because an action for quantum meruit is quasi-contractual in nature, the applicable statute of limitations is six years. Therefore, though the plaintiffs' statutory claims are time barred by the three-year statute of limitations, the defendant's violations fell within the six-year statute of limitations for actions contractual in nature and, thus, may form the basis for liability under those claims. As a result, it is a triable issue whether (1) The plaintiffs did confer a measurable benefit upon the defendant, namely in fulfilling their duties as Servers in the banquet department and the PDRs; (2) the defendant accepted the services of the plaintiffs with the expectation, and in fact the statutory duty, to compensate them for their services; and (3) the plaintiffs performed their duties as Servers while reasonably expecting that the defendant would compensate them according to its statutory duty to do so.

**\*13** The defendant, thus, is not entitled to summary judgment on this issue.

#### 2. Intentional Interference with Contractual Relations (Count III)

To succeed with this cause of action, the plaintiffs "must prove that (1) [they] had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, and (3) the plaintiff[s] [were] harmed by the defendant's actions." *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812 (1990). See also, *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 476 (1992). Additionally, it has been held that the plaintiffs must also show that the defendant acted "improperly" in its interference, if any is shown. *United Truck Leasing Corp.,* 406 Mass. at 816-17. Violation of a statute may provide evidence to satisfy this additional requirement. *Id.* at 817.

The defendant, however, "cannot be liable for claimed tortious interference with the employment relationships between itself and its employees, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                         Page 12
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

plaintiffs." *Appley v. Locke,* 396 Mass. 540, 543 (1986). The only other option, therefore, for the plaintiffs here, is to prove that they had an enforceable contract with the Hotel guests. The plaintiffs here have not shown that they had a valid and enforceable contract with Hotel customers regarding the payment of service charges. Therefore, the defendant is entitled to summary judgment with respect to Count II.

### 3. Breach of Contract (Count IV)

In order to have a viable breach of contract claim, the plaintiffs here carry the burden of proving that there was a contract between the Servers and the defendant. *Canney v. New England Tel. & Tel. Co.,* 353 Mass. 158, 164 (1967), citing *Breed v. Berenson,* 216 Mass. 397, 401 (1914). To this end, "[a]n implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract ... Otherwise expressed, if a person knowingly receives services and other benefits, and there is no evidence that those services and benefits were being furnished gratuitously, the law implies a promise to pay the value of those services and benefits." *Popponesset Beach Ass'n v. Marchillo,* 39 Mass.App.Ct. 586, 592 (1996), citations omitted, review denied at 422 Mass. 1104 (1996).

Though the plaintiffs here were employees at will, there remains a genuine issue of material fact as to whether there was an implied, at-will contract between each of the plaintiffs and the defendant and, if so, whether implied in these contracts was the defendant's duty to compensate the plaintiffs according to its statutorily imposed duties. The defendant is thus not entitled to summary judgment on this claim.

### 4. Breach of the Covenant of Good Faith and Fair Dealing (Count V)

It remains an issue of fact whether there was an implied at-will contract between the plaintiffs and the defendant which, if it is found to exist would carry with it an implied obligation of good faith and fair dealing, because "[e]very contact implies good faith and fair dealing between the parties to it." *Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451, 471 (1991), quoting *Warner Ins. Co. v. Comm'r of Ins.,* 406 Mass. 354, 362 n. 9 (1990). See also, *King v. Driscoll,* 424 Mass. 1, 7 (1996). "The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract ..." *Anthony's Pier Four, Inc.,* 411 Mass. at 471-72, quoting *Druker v. Roland Women's Jutras Assoc., Inc,.* 370 Mass. 383, 385 (1976).

**\*14** Though this Court finds as a matter of law that the defendant has violated the Massachusetts Tips Statute, G.L.c. 149, § 152A, it remains an issue of fact for the jury as to whether this constitutes a breach of the covenant of good faith and fair dealing. Therefore, the defendant is not entitled to summary judgment on this claim.

### 5. Conversion (Count VI)

A viable conversion claim requires a showing that there was a "wrongful exercise of dominion over personalty, including money, to which a plaintiff has an immediate right of possession." *Schmid v. Nat'l Bank of Greece, S.A.,* 622 F.Sup. 704, 713 (D.Mass.1985), affirmed at 802 F.2d 439 (1st Cir.1986), citing *Marshall Vessels, Inc. v. Wright,* 331 Mass. 487 (1954); *Morrin v. Manning,* 205 Mass. 205 (1910).

The plaintiffs had an immediate right of possession in the portions of the service charges not paid to them by the defendant who, in turn, wrongfully exercised dominion over those monies as evidenced by their violation of the Massachusetts Tips Statute. Conversion, however, is a tort and therefore carries with it a three-year statute of limitations pursuant to G.L.c. 260, § 2A. As discussed in the statute of limitations section, *supra,* this claim is time barred and, thus, the defendant is entitled to summary judgment with respect to Count VI.

### 6. Unjust Enrichment (Count VII)

The theory of unjust enrichment is that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Nat'l Shawmut Bank v. Fidelity Mut. Life Ins. Co.,* 318 Mass. 142, 146 (1945), quoting American Law Institute Restatement of Restitution § 1. The benefit recipient, however, is only liable to the other if, under the circumstances, it would be unjust for the recipient to retain the benefit without compensation therefore.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                          Page 13
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

*Nat'l Shawmut Bank,* 318 Mass. at 146.

Because unjust enrichment is a remedy that is contractual in nature, and for the substantive reasons discussed in the quantum meruit section, *supra,* there remains a triable issue as to whether the plaintiffs have a successful claim of unjust enrichment for the time periods set forth in the same section. The defendant, therefore, is not entitled to summary judgment on this claim.

I. *The Plaintiffs' Motion for Class Certification*

G.L.c. 149, § 150 indicates that a person allegedly aggrieved by a violation of Section 152A, as is the case with the plaintiffs here, may bring an action "in his own name and on his own behalf, or for himself and for others similarly situated ..." The Massachusetts Rules of Civil Procedure, in addition, require that in order to maintain a class action, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Mass.R.Civ.P. 23(a).

**\*15** The plaintiffs here argue that in light of the language in Chapter 149, Section 150 permitting class actions, they are exempt from the requirements of Rule 23 and are automatically entitled to class action status. This Court, however, disagrees with this entitlement argument that is notably lacking in legal support and because the plaintiffs do not make any assertions with regard to Rule 23 compliance, the plaintiffs' motion for class certification must be denied.

*ORDER*

For the foregoing reasons, it is hereby *ORDERED* that (1) the defendant's motion for summary judgment is *ALLOWED* in part with respect to Counts I, III, and VI, and *DENIED* in part with respect to Counts II, IV, V, and VII; (2) the plaintiffs' cross motion for summary judgment is *DENIED;* and (3) the plaintiffs' motion for class certification is *DENIED.*

Mass.Super.,2004.
Williamson v. DT Management, Inc.
Not Reported in N.E.2d, 17 Mass.L.Rptr. 606, 2004 WL 1050582 (Mass.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.